24-2950 Guglielmi v. The Republic of Argentina 24-2950 Guglielmi v. The Republic of Argentina 24-2950 Guglielmi v. The Republic of Argentina 24-2950 Guglielmi v. The Republic of Argentina 24-2950 Guglielmi v. The Republic of Argentina The origin of Argentina's argument on this is the single occurrence of the word disassembly in the trust agreement that was set up for administration of the tax credit program. And in Article V of the trust agreement, which is at page A-103 in the record, it says the trustor, meaning the bondholders, accepts, consents, and agrees, and then there's a list of things, and this is three little I's, for the disassembly of the securities, meaning the bonds, for their crediting as CCFs or CCs in the respective account and subaccount. Now, I think we characterized that as a glancing reference. It's at page A-103 in the joint appendix. That, in fact, happened. The bonds went into the trust, the CCFs, which represented interest. And it collected the interest and the equivalent of the interest. Yes, the semiannual interest. Now they're complaining about the principal, so we get that. Right. I think you can jump right to the end. This is helpful poignant to hear, but now I want to get to, I think, the question of, do they need to be reassembled, right? That's where the fight is. Right. So disassembly is one thing, reassembly is something else. The word reassembly is not used anywhere in the trust agreement. It's a metaphor or not. But tell us why, however you want to describe it as a physical act. I know you say they're electronic. There's nothing physical to reassemble all that. But why the concept should not happen? Your client shouldn't have to pay, put back in the money that's the equivalent of the interest payments to get it back. I think we all know what it means. The reason is that there is no basis in any of the tax program documents, either the trust agreement, either all the government regulations setting it up. So what do you do about it? I think it's a DMOC, if I'm getting the name right, the Argentine Supreme Court case. Yes. It seems like that's what the other side is hinging on. They can tell me if I'm wrong, and you're saying, yeah, that's a totally different thing that has no applicability here. You know my whole argument. Yes. Well, no, but explain for us why, and they can explain the other side, why you think that's apropos of nothing, DMOC. So if I may, there's one other piece before I get to DOMEC, and that is the government regulations that were promulgated in connection with the tax credit program back in 2001. There's no reference to disassembly or reassembly in the government regulations. But there is a reference at the beginning of Decree 1005-2001, that's the year it was promulgated, which said, as part of the preamble, quote, "'Whereas this tax credit program does not require any fiscal effort by the national government since its commitments will be fully complied with upon maturity in the usual manner.'" Now, if you think about what those words mean, the commitments are the commitments of the government to, in our view, repay the principal on the bonds, will be fully complied with upon maturity. That confirms that it's talking about repayment of principal, which is what happens by definition when bonds mature. Remind me the year that you said it, but remind me the year of that law, the decree. 2001. 2001. In the usual manner is the way that clause ended. So our point on that is the usual manner does not include requiring the bondholder to repay all of the tax credit benefits that he or she received from 2001 until 2012 for one of the bonds or until 2017 for the other issuance. Let me ask you just a question about this issue of the reassembly. And I don't know if my numbering of the Bugliotti cases matches yours, but to be clear, I'm talking about the case, what I call Bugliotti 3, which was decided by Judge Preska on March 31st and then appealed to this court on two issues. And I understand the argument that this court didn't address one of the issues Judge Preska addressed, which was she found that you needed to re-aggregation or reassembly. Correct. Another word for reassembly was needed prior to suit being filed. Yes. And that issue, both issues are appealed. This court said assuming reassembly is achieved, you need permission. Judicial authorization.  Hello. So I get the argument that this court didn't address that issue. I understand that argument that's been made and that collateral estoppel doesn't apply. So my question assumes no collateral estoppel, but Judge Preska addressed the issue. How did she get it wrong? Well, she got it wrong, number one, because she said it only in the last sentence of her decision on the motion to dismiss leading up to the appeal. And I have that reference here somewhere. I just want to find it. That's where she takes what you say is the leap from the Argentine Supreme Court decision that says Argentina's government created a debt exchange program. The terms of the program required reassembly if you wanted to take part in it. And you're saying that she, and I guess your other side's legal expert, then took a leap from saying that because it was required to reassemble for that particular program, reassembly is also required even to sue on a default. That's what I understand your argument to be, that there's no requirement that reassembly be required to bring suit on the bonds because you've only got an Argentine Supreme Court thing that says there was a particular program. Participation required reassembly for that program. There's nothing in that Argentine Supreme Court decision that says you've got to reassemble for other purposes. That is correct, yes. But I'd still like an answer to my question. Would I appreciate my colleague's, you know, attempt to answer my question? But my question to you is how did Judge Preska get it wrong? Well, she got it wrong for the same reasons that I've described here. There is no basis in the law setting up the tax credit program that would give any participant, including my clients, back in 2001 when they were considering going into the tax credit program, wow, if we go into this program at the end of the bond maturity in a couple of decades, if we want to get our principal back and the government is not voluntarily providing it and we have to sue the government, which is this lawsuit, in order to recover principal, are we going to have to repay every peso of tax credit that we have received from the government the beginning to the two maturity dates of the bond as a precondition to bring that lawsuit? And the answer is there is nothing in either the law or the trust agreement that clued in my clients that they would have to repay all of this money under the rubric of reassembly. And reassembly doesn't even necessarily mean refund. It's several leaps beyond what could have been apparent to my clients. Well, the tax credits were because the government couldn't make good on the bonds, right? Your clients did a patriotic gesture. So why couldn't they have conceived that, you know, in lieu of getting the bond money, this was the alternative in the meantime to help the government out? Well, if someone, if a bondholder at the end was going to file a lawsuit, normally that bondholder would file a lawsuit to get interest that had not been received. Now, my clients got something instead of interest, which was tax credits, so we did not include a claim for interest in our complaint here. We think we are being scrupulous in recognizing that it's the principle that counts. And nothing told my clients that they were giving up the $35-plus million in principle, the ability to recover it without doing a refund of 12 or 17 years' worth of tax credit. Was your argument then, in my understanding, you were saying that there was nothing up front telling your clients this would be a consequence in the future? Absolutely correct, yes. So I think I understand that. Reconcile that then, how does that fit with DOMEC or DMOC? DOMEC, right? DOMEC is the case. If you read DOMEC carefully, and it's an Argentine decision that's not exactly written in what we would anticipate, you will see that it describes the reassembly requirement only as something that was promulgated by the government as part of the debt exchange program that was being ruled on in the DOMEC case. Which is a debt exchange program that arose years after your clients opted into this tax credit. There were two debt exchanges that were realized, one in 2005, one in 2010. So if your argument, I'm just trying to make sure I understand it right. Yes. Is that your clients would never have been able to foresee when they bought, when they opted into this tax program, these tax certificate programs. Yes. Was it then, or is it they couldn't have foreseen when they bought the bonds? I guess it's when they opted into the tax credit program. No, it's the tax credit program. They would never have foreseen that if it all went to hell, they would have to then reassemble the bonds, so to speak. And that's different, you're saying, from DOMEC, because then down the road, when the Argentine government puts out another option and says, hey, folks, if you want, you can opt into this by the way to require reassembly, then fine. Then you reassemble, you follow the new program, or you don't. Or you don't, yes. You're left in your original position. Absolutely correct. All right, all right. Thank you. Let me just see. I think there are no other questions for now, but you've reserved a couple of minutes for rebuttal. Let's hear from, is it Mr. Mookie? For the appellee. And considering you saw that we were very focused on the reassembly, maybe you could start with that at least. Yes, Your Honor. Happy to. May it please the Court, Raul Mookie from Cleary Gottlieb on behalf of the Republic of Argentina, the appellee. I'm happy to start with reassembly. So Judge Preska did, as Judge Kahn noted, address this in Bugliotti III. We also call it Bugliotti III. I think my colleague gave her short shrift. She dealt with it more than just one sentence. It's at the end of her decision. That's correct. It's at appendix 382, 383 and page 8 of the Westlaw site. And what she said was that she looked at both Argentina's expert, Mr. Bottini, as well as the plaintiff's expert on Argentine law, and the DOMAT case that we've been discussing, and said that Argentina's expert, in her view, put forward the more persuasive interpretation that DOMAT was not just limited to the exchange offer. It was a bigger principle. Yeah, what's our standard of review for district court's findings with respect to the meaning of foreign law? I believe that's de novo. Okay. And she looked at the competing expert opinions, read the decision, and found the— Is there a requirement in the underlying documents, the basis for the reassembly requirement? What is it, apart from an expert say-so? Yeah. Section 5, Romanat III of the trust agreement, says that the bonds are being disassembled. That's our argument as to where it's in the underlying— Well, they're being disassembled. They're being disassembled. I get that. Yeah. I think the question now is, where's the requirement that when Argentina defaults, they have to get reassembled? That doesn't necessarily follow. So where does that come from? Well, we argue it does necessarily follow, but from the DOMACC— Okay, then why? Why does that not necessarily follow on its own? I get when you say, oh, when you read DOMACC, and there's a rule. But are you saying they're just reasoning in the light of, I don't know, natural law or something? What we see from the trust agreement says that because you have to disassemble, if you want to sue us, you must then do X, Y, Z, and X is reassembled? Well, that's our argument just by function. Okay, tell me that. Walk me through that, how reason or logic tells us that. Just by the logic of if the bonds are disassembled from principle and interest, in order to bring a claim for either of those, the bond needs to be reconstituted. So I have a bond. You chop me in half. You pay me half, you don't pay any other half. You say, well, pay up the half you owe me. You're like, oh, no, no, repay me the half I gave you, so then you can sue me for the whole thing. I mean, if that's just reasoning from, you know, I don't know, pure logic, I don't get where you get there. Well, the practical reason is to protect against double recovery. But they were only suing for half. So they're only asking for half recovery. So what is your projection that they were accidentally going to get double recovery from you? They are suing both in Argentina for principle as well as— Well, they can sue in Argentina for a million things, emotional distress. I mean, suing in two forums, maybe you get double recovery. But here, I mean, I get that you were arguing international comedy. They're suing in Argentina, go away from New York. That's out the window for the moment. So I think we're only asking in this case what's going to happen. Are you arguing that in this case that's now before us, there's a chance of double recovery? Yes, because the plaintiffs currently are suing in Argentina for principle on the CCC. Time out. Time out. And the reassembly would mean taking the tax credits that they were given. In essence, they have to repay what the credits that they got. Correct. But they also didn't get interest. Correct. And so it's like a quid pro quo, the tax credits. They got tax credits. They gave up the interest. Why can't that be treated separately from the principle? And they are only suing in this case for the principle, right? Well, again, our argument is that in order to reassemble, yes, you have to pay back the tax benefits that they received. But they also have to tender the CCs. You keep saying that, but why? I mean, doesn't it make sense that the other two cancel each other out? The tax credits and the failure to pay the interest, that they cancel each other out? And it makes sense just to talk about the principle now. Doesn't that make sense? Well, again, I don't mean to— Does that make sense? I don't think so, Your Honor. Why not? Because, again—and I don't mean to frustrate the court—the CCs are part of the reassembly. And they are seeking in Argentina return of the same principle that they are seeking. Okay, let's say they sued in Argentina and in Brazil and in New York and in France. And you said they're looking for a quadruple recovery. That's not our problem now, right? Then you're going to get into sort of collateral estoppel, res judicata issues. You know, if they were suing here for principle and interest and they're suing in Argentina for principle and interest, then, yeah, you get double recovery. But our question is, we have one case in front of us. We're not looking at the international comedy issue now. So we're not worried about what's going on in Argentina. They could be asking for a billion dollars in Argentina. That's not the issue before us. We have to act as though this is one case, one case. And I don't understand how you're saying that they're looking for double recovery here. They're only asking for the interest. As far as I can tell, unless you're telling me, no, no, no, you misread the complaint. They're asking for the principle. And I'm sorry, they're only asking for principle here. They're not asking for interest. I flipped it. Unless you're going to tell me, no, they're actually asking for both. No. In this case, they are only seeking principle plus post-monetary interest. I agree with that. In Argentina, they are seeking repayment of the same principle. And so in order to prevent double recovery. They could seek principle and interest in Argentina. And you could say, well, that's nuts because you've got the interest in the form of the tax credits. It's triple recovery. But, again, I don't understand. Unless we're going to international comedy and saying, how dare you bring suit in two places because maybe then I get double recovery. That I get. Or I could see if they were suing now and saying, I want principle and the interest. And you say, what are you talking about? You got the tax credits that were a surrogate for interest. So now you're trying to have your cake and eat it too. But why are they asking for double recovery? If you put Argentina out of the place, out of our mind, are they seeking double recovery? If you take Argentina out of the equation, the Argentine lawsuit. If you take Argentina, I don't think you can. But if you take Argentina out of the equation, yes, here they are seeking principle. They are not seeking the coupon interest. I agree with that in Southern District of New York. Let me try it a different way. These bonds are freely transferable. That amount of principle is represented both in the CCs as well as the bond. If they were to just get the bond back without tendering the CCs, they could sell that bond on the market. They still trade. Someone else could bring a lawsuit on that bond. They would still be suing. You're saying that double recovery is that they want to get compensation for the bond and they still want to hold on to the CCs. That's what your double recovery is? Correct. That CC principle and the bond principle represents one obligation to pay principle by my client. So now tell me why reassembly is necessary and why it would not be adequate for them to say, okay, here are your CCs back. God bless you. Have fun with them. I've already cashed in the CCFs, right, those interest parts. Here are your CCs. I haven't reassembled the bonds. I haven't put them back together in the CCF. Yeah, that's right. If you give me my principle back, here are the CCs. Would that solve your double recovery problem? Well, no because it's the same issue. If they get the bonds back, right, and then Why do they get the bonds? I thought they want payment on principle. I don't think they want the bonds. Unless I'm mistaken. He can tell me. I thought he just wants the principle dollar amount or whatever pays for them, the principle amount represented by the bonds. He's asking, are you saying he wants the bonds back, the whole bond? Well, they are seeking to terminate the trust and receive the bonds and bring Here with us? Well, that is the procedure that we believe is required. That's not what they're asking for. I don't think they're asking. Is that what they're asking for? I thought they wanted a check from Argentina saying this is how much you owe me. Correct. We believe that that is the proper procedure under DOMATCH. They disagree. I agree with that. Can I just ask, is that why Judge Preska, in her opinion, said, Look, this is going to be tricky because you got these tax credits and how do you give the money back and to reassemble these bonds? She acknowledged that procedurally this is a tricky issue. But I have a question to ask you about Judge Preska's decision of why reassembly was necessary. It is not in the appendix on appeal, but it was a document submitted in connection with Gugliotti III, which was the Procuración General of the Nation, the Attorney General's opinion to the Supreme Court of Argentina, which accepted the opinion. There's a clause on page 14 and 15, albeit it's in Spanish, but it appears to suggest that as part of that trust agreement, in order to get the bonds back or the principal, that they would have to reassemble the bonds. And it refers to legal degrees Article 4, 1226.01 and 2243.02. Were those articles in existence in 2001, 2002? If you know, because that was an exhibit your client submitted to Judge Preska. I don't know the answer. Okay. All right. It suggests that, of course, it is in Spanish, but I believe it was translated for Judge Preska. It suggests that as part of the trust agreement, if they want the bonds back for precisely what you just indicated, you can't have the money in the bonds. You're going to need to reassemble them. Is that the argument in that sense? That's been our argument, and it is the fact that these represent the same obligations, the bonds that were tendered as well as the CCs and CCFs. And so if they are not re-aggregated, then there is the possibility of double recovery. And we think we are seeing that based on they're suing on the same principal amount in Argentina as they are here. Well, they may just be suing in both jurisdictions to see, let's see which one requires reassembling. Where can we get a recovery first? That's another explanation. Right. And we think and we cited principles that U.S. courts... Your argument isn't that they're trying to seek, let's see where we get a good judgment first, Argentina or the United States. Your argument is, yeah, you can't create a trust and put bonds and get something else in return and now want your bonds and the principal. Correct. That's in essence your argument.  There has to be a mechanism for achieving that. Correct. And my question is, apparently, according to the Attorney General, the laws that were established at the time this trust was created required reassembly. Am I misreading that? I would have to go back and check since they weren't in the appendix. We're happy to put in a supplemental letter to address it if the court pleases. Because from a 30,000-foot view, it makes sense. You can't offer people a tax credit in lieu of giving them dividends and then expect them to forego those and just get the principal. That's why I asked. Thank you. I don't know if it would be helpful. You suggested maybe providing a supplemental letter. Maybe by this Friday if you would just attach that. If it was in the record before the district court and if it's not in the appendix, perhaps the parties can confer, make sure that that's transmitted to us if indeed it was in the district court record. And what do you say? Maybe no more than a three-page supplemental letter from each of you by this Friday on what, if anything, you think, what bearing that has on the court. Do you both understand the document to which Judge Connors was referring? It was an exhibit before Judge Preska's case. And this is the? AG opinion adopted by the Argentinian Supreme Court. Omitted from Appendix A, but it was an exhibit before the district court. Why don't you confer with each other afterwards? Yes. And if you can figure out exactly what you're talking about, fine. If not, maybe let the court know. We can always issue a written order specifying in detail what we're asking for. Does that sound agreeable to the parties? Yes, Your Honor. Why don't we hear from Mr. Spencer now? Mr. Spencer, you've reserved two minutes. Your Honor, I know I've gone way over, but may I address statute of limitations? Nope. Thank you, Your Honor. But we are grateful for your brief, which does a very thorough job of addressing the issues. Thank you, Your Honor. Thank you, Your Honor. But, Mr. Spencer, you have two minutes, and we'll try to keep it to that. With respect to the last point, I would just ask, if we're going to exchange letters, that it be responsive, because I'm going to have to respond to what he says. Yeah, so why don't we do this? Why don't we have, since Counsel, Mr. Mookie, this came up in your argument, why don't we say if we can figure out, if you can mutually figure out what document we're talking about, you filed your three things, your three pages by this Friday. And, Mr. Spencer, what do you think, next Wednesday? Does that sound reasonable? There goes my weekend, but, yes, that's fine. All right. You know what? Next Friday. All right. Thank you. There we go. We don't want to ruin anyone's weekend. Thank you. Let me make it clear what we are looking for in this lawsuit, if we win this appeal, a money judgment, not a check, not an exchange. Yeah, what would you do with the bonds that are on deposit with CAHA? So the way it has always worked with respect to these bonds is that any payment by the government, whether in response to an execution or, more likely, a settlement, has to be accompanied by the bonds given to the government in exchange for the consideration. And every settlement And would that also go for, I'm going to get it wrong, I always get the CCs and the CCFs mixed up. Is this the CCs would also be surrendered if you got full payment? So the bonds, the bonds themselves are still on deposit at CAHA de Valores. So those bonds would be given to the government in exchange for But what about the CCs? You're right. We have never talked about that. What would happen? In our view, the CCs do not provide a promise to repay. They're like a hat check. They're not a promise to repay. But in any event, to remove any doubt Do they go proof or something? Or what do they do? We would burn them. We would give them back to the government. Okay. At that point, they would be All right. But you don't think that you get to hold on to them at some point, seek to extract value from them? We would find a way to prevent ourselves from doing that. Okay. One of the things that I I burned about a minute and a half of your time talking about what our schedule of briefing would be. So why don't we just set the clock? Well, no, we'll just give you a You know what? I do not have much reply argument here. All the better. Judge Kahn, you asked about some later promulgated rules or regulations or decrees. The way you can tell is every number ends in a slash and then a two-digit. Right. And I think it was 02, the one you said. One was 01, 122601. The other was 22402. And these were created in 01? 122601 is the main law setting up the tax credit program.  Anything in 02 or 03 was after the tax credit program. So I don't know the 02 one that you're asking about, but that's how you tell. Thank you. Thank you. I guess my only point, and it's repetitious, so it's going to be very short. I read you the whereas clause that is in the law promulgating the tax credit program, saying whereas the national government is going to repay these bonds in the usual course. That is the only text of the law that speaks to whether there should be a refund provision or not, because in the usual course does not include a refund of all the interest you paid in order to get repaid the principal. So to the extent that you need some additional textual evidence here about what the government and the participants were led to expect or expressed what would happen then, in our view that supports our position.  Thank you. Thank you both very much. Very, very interesting and very complicated case. We do appreciate your briefing and your oral argument here today with us. We will take the case under advisement.